# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| THE RICHARDS GROUP, INC., | § | |
| | § | |
| Plaintiff, | § | NO. 3:06-CV-0799-D |
| | § | ECF |
| v. | § | |
| | § | |
| JEFFREY S. BROCK AND BROCK | § | |
| MUSIC PRODUCTIONS, INC., | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

LACKEY HERSHMAN, L.L.P.
Scott S. Hershman
State Bar No. 00793205
Jamie R. Welton
State Bar No. 24013732
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas  75219-4241
Telephone: (214) 560-2201
Telecopier: (214) 560-2203

ATTORNEYS FOR PLAINTIFF
THE RICHARDS GROUP, INC.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

THE FACTS ............................................................................................................................. 2

A.   The Players .................................................................................................................... 2

B.   Brock Forms BMI And Develops More Than Half Of His Business In Texas. ................. 3

C.   Brock Represented Copyrighted Material As Original To The Richards Group And Failed To Indemnify It When The Copyright Owner Promptly Sued The Richards Group And One Of Its Most Important Clients. .................................................................................. 4

D.   The Richards Group Prevails In Arbitration Against BMI In Texas. ................................ 7

E.   Brock Forms BMPI To Evade The Judgment And Usurps Assets And Opportunities Of BMI For His Personal Benefit. ....................................................................................... 8

SUMMARY OF ARGUMENT ............................................................................................... 13

ARGUMENT .......................................................................................................................... 14

A.   The Applicable Standards. ............................................................................................ 14

B.   The Court Has Personal Jurisdiction Over BMI And Should Attribute Its Contacts To Brock And BMPI. ......................................................................................................... 16

    1.   The fiduciary shield doctrine is inapplicable. ........................................................ 16

    2.   Alter ego .............................................................................................................. 18

    3.   Sham. ................................................................................................................... 20

    4.   Single business enterprise. .................................................................................... 21

C.   Brock's Personal Interests Arising Out Of And Related To The Contract Give Rise To Specific Jurisdiction Over Him. .................................................................................... 22

D.   Exercising Personal Jurisdiction Over Brock and BMPI Does Not Offend Traditional Notions Of Fair Play And Substantial Justice. ............................................................... 22

REQUEST FOR RELIEF ....................................................................................................... 24

CERTIFICATE OF SERVICE ............................................................................................... 26

SIGNATURE .......................................................................................................................... 25

CERTIFICATE OF SERVICE ............................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>CASES</u>

*Alpine View Co., et al. v. Atlas Copco AB, et al.*,
   205 F.3d 208 (5th Cir. 2000) ...................................................................................14, 15

*Archer v. Griffith*,
   390 S.W.2d 735 (Tex. 1964)...........................................................................................20

*Asahi Metal Indus. Co. v. Superior Court*,
   480 U.S. 102 (1987)...................................................................................................15, 24

*Berry v. Lee*,
   428 F. Supp. 2d 546 (N.D.Tex. 2006) .................................................................18, 21, 23

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)..............................................................................................14, 15, 22

*Castleberry v. Branscum*,
   721 S.W.2d 270 (Tex. 1986).................................................................................16, 18, 20

*Doe v. Unocal Corp., et al.*,
   27 F. Supp. 2d 1174 (C.D.Cal. 1998) ...................................................................... 18-20

*El Puerto de Liverpool S.A. de C.V. v. Servi Mundo Llantero S.A. de D.V.*,
   82 S.W.3d 622 (Tex.App.2002, pet dism'd w.o.j.)....................................................21, 22

*Engel v. W.R. Berkely Corp.*,
   2001 WL 238113 (N.D. Tex. 2001).................................................................................15

*Fowler v. Broussard, et al.*,
   2001 WL 184237 (N.D.Tex. 2001)..................................................................................17

*Gardemal v. Westin Hotel Co.*,
   186 F.3d 588 (5th Cir. 1999) ..........................................................................................18

*Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*,
   85 F.3d 201 (5th Cir. 1996) ............................................................................................23

*Harwood Tire-Arlington, Inc. v. Young*,
   963 S.W.2d 881 (Tex.App. — Fort Worth 1998, writ dism'd by agr.) ................. 18, 19-20

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   66 U.S. 408 (1984)...................................................................................................... 14-15

ii

*Holfield v. Power*,
  382 F. Supp. 388 (D.Md. 1974) ........................................................................................17

*IBC Manuf. CO. v. Velsicol Chemical Corp., et al.*,
  187 F.3d 635 (6th Cir. 1999) ..........................................................................................18

*Ingenious Investments, Inc. v. Bombart*,
  2006 WL 1582080 (N.D.Tex. 2006) (slip op.) ..........................................................15, 16

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec, et al.*,
  2005 WL 822911 (W.D.Tex. 2005)..............................................................................21-22

*King v. Enterprise Leasing Co. of DFW*,
  2006 WL 784885 (N.D.Tex. 2006)..............................................................................15, 24

*Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc.*,
  519 F.2d 634 (8th Cir. 1975) .......................................................................................17, 20

*Nichols, et al. v. Pabtex, Inc.*,
  151 F. Supp. 2d 772 (E.D.Tex. 2001) .........................................................................18, 19

*Optimum Return LLC v. Cyberkatz Consulting, Inc.*,
  2004 WL 827835 (N.D.Tex. 2004).................................................................................17

*Stuart, et al. v. Spademan*,
  72 F.2d 1185 (5th Cir. 1985) .......................................................................................16, 17

*Thomas, et al. v. Lytle, et al.*,
  104 F. Supp. 2d 906 (M.D.Tenn. 2000).........................................................................18

*United States v. Jon-T Chemicals, Inc.*,
  768 F.3d 686 (5th Cir. 1985) .........................................................................................19

*Wien Air Alaska, Inc. v. Brandt*,
  195 F.3d 208 (5th 1999)........................................................................................................

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980)..........................................................................................................14

*Wyatt v. Kaplan*,
  686 F.2d 276 (5th Cir. 1982) ..........................................................................................15

## **SECONDARY MATERIAL**

STEPHEN B. PRESSER, PIERCING THE CORPORATE VEIL
     § 2:47, CH. 2:  STATE LAW ON PIERCING THE VEIL: TENNESSEE (Apr. 2006) ....................18

**TO THE HONORABLE SIDNEY A. FITZWATER,**
**UNITED STATES DISTRICT JUDGE:**

The Richards Group, Inc. ("The Richards Group" or "Plaintiff), submits this Response to the motion to dismiss for lack of personal jurisdiction filed by Defendants Jeffrey S. Brock ("Brock") and Brock Music Production, Inc. ("BMPI") (collectively, "Defendants"), as follows:

## PRELIMINARY STATEMENT

Plaintiff seeks to pierce the veil of Brock Music, Inc. ("BMI") and hold Brock and BMPI liable for the judgment obtained against BMI by The Richards Group after a contested arbitration in Texas. Defendants, on the other hand, ask this Court to honor an abused corporate form no longer in existence. At this stage, Plaintiff only needs to present a *prima facie* case for one of its veil piercing theories to attribute BMI's contacts with Texas to Brock and BMPI.

Plaintiff has presented far more than a *prima facie* case. It has proven that BMI was undercapitalized, was owned and operated by Brock, and did not pay Brock rent for the recording studio from which BMI did business and Brock owns. It has also proven that Brock made undocumented interest-free loans to BMI, pilfered BMI's accounts, usurped its business opportunities for his personal benefit, and personally pocketed monies received from renting BMI's recording equipment. Plaintiff has also proven that BMPI was formed one week before the judgment against BMI was obtained and engaged in the same business, from the same location, with the same directors and employees, for the same owner, and with monies rightly owed to BMI that Brock provided in the form of another undocumented interest-free loan. Based on the evidence presented, BMI's contacts should be attributed to Brock and BMPI, which gives rise to specific jurisdiction. Even if BMI's contacts are not attributed to Brock, Plaintiff has also shown that Brock's personal contacts are sufficient to support jurisdiction over him in this suit. As such, Defendants' motion should be denied.

## THE FACTS

### A.  The Players.

The Richards Group is a corporation proudly organized and existing under the laws of the State of Texas with its principal place of business at 8750 North Central Expressway, Suite 1200, Dallas, Texas 75231.  The Richards Group is one of, if not the premier, full-service advertising agencies in the United States.  It is an award winning, nationally recognized agency known for its creativity and integrity.  The President of The Richards Group — Stan Richards — has lived and worked in Dallas, Texas, for more than 50 years.  He is a member of the prestigious Art Directors Hall of Fame, which includes the likes of Walt Disney, Norman Rockefeller, and Andy Warhol.  Richards has also received the "Reddick Award" from the University of Texas, along with Walter Cronkite, Ted Turner, and Bill Moyers.  Representative campaigns include Chick Filet's "Eat More Chicken," Motel 6's "Tom Bodette," and the billboards for Dallas Children's Hospital that are seen throughout the metroplex.

At all relevant times, Brock was the President, Chairman, and sole shareholder of BMI and BMPI.  *See* Brock Dep. at 9-10, 13-14, 59 (A 147-48, 159, 162); *see generally* Corporate Documents (A 46-55); Incorporation Documents for BMPI produced by Defendants (A 60-65).[1] BMI and BMPI were/are corporations organized under the laws of the State of Tennessee with their principal place of business at 2937 Berry Hill Drive, Nashville, Tennessee 37204 ("Recording Studio").  Brock Dep. at 9, 24, 59-60 (A 147, 150, 159); Corporate Documents (A 46-59).  The Recording Studio is owned by Brock and his wife, Joan.  Brock Dep. at 150 (A 182).  Brock often refers to his personal real estate interests as "Brock Properties," which is merely the name he has given to what is otherwise a sole proprietorship of Brock and/or his wife.

---

[1]  Accompanying The Richards Group's Response to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction is an Appendix in Support thereof ("A").

*Id.* at 60, 84 ("Q.  Who does BMI lease office space from?  A. Me personally though a company called Brock Properties, which is a sole proprietorship. . . . Jeffrey Brock d/b/a Brock Properties, yeah, it's all part of – it's just a sole proprietorship.") (A 159, 165).  BMI, however, pays the property taxes for the Recording Studio.  *Id.* at 107, 150 (A 171, 182).

**B.    Brock Forms BMI And Develops More Than Half Of His Business In Texas.**

After graduating from Abilene Christian University in 1973, Brock incorporated "Brock Musical Productions, Inc.," in 1979 for all lawful purposes, including the production of "jingles, songs, advertisements and other musical compositions."  ACU Brochure (A 72-74); Charter of Brock Musical Productions, Inc. (A 43).  In 1983, Brock amended the Charter of Brock Musical Productions, Inc., to rename the corporation "J.S. Brock Musik, Inc."  Articles of Amendment to the Charter of Brock Musical Productions, Inc. (A 45).  At all times, Brock has been the President, Chairman, and sole shareholder of the company.  Corporate Documents (A 46-55).  Brock's wife, Joan, was the only other member of the Board and served as "Secretary."  *Id.*

In 1985, however, the Charter for J.S. Brock Musik, Inc., was revoked and the company reverted to a sole proprietorship.  Tennessee Secretary of State Certification for Brock Music, Inc. (A 42).  Brock continued to operate the business as a sole proprietor from 1985-89.  *Id.*; Screen Captures from BMI Website (files Learn/about/history) (A 75).  In 1989, "J.S. Brock Musik, Inc." was reinstated and Brock changed its name to "Brock Music, Inc."  Tennessee Secretary of State Certification for Brock Music, Inc. (A 42); Articles of Amendment to the Charter of J.S. Musik, Inc. (A 45-46).

In the early 1990s, Brock "called on Dallas" as his territory to develop sales for BMI.  Brock Dep. at 49-50 (A 157).  Brock and BMI began working with The Richards Group *circa* 1994. *Id.*  Brock recalls "dozens" of projects over the years, so many he could not "remember

them all." *Id.* at 48 (A 156).  In addition to The Richards Group, Brock estimated he had twelve other clients in Texas.  *Id.* at 54 (A 158).

From 1989-2005, Brock remained the President, Chairman, and sole shareholder of BMI, with his wife serving as Secretary.  BMI's Annual Reports (A 47-55).  BMI has never had any other officers, directors, or shareholders.  *Id.*

BMI's website touts BMI's twenty-plus years in business, its state-of-the art Recording Studio and equipment, and the work it has done for The Richards Group and other Texas-based clients.  Screen Captures from BMI Website (A 75) (*e.g.*, files Learn/about/history, Look/technical specs, Look/virtual tour, and Look/commercial reel/Jeff Brock: Composer's Video Reel).  The bio on BMI's website for Brock highlights his Texas roots.  *Id.* ("Jeff started his professional music career as a studio singer in Dallas, TX.  He later worked as a full-time writer at a Dallas music production company.").  In the last five years, work with The Richards Group accounted for half of BMI's business.  Brock Dep. at 52-53 (A 157-158).  For each project, Brock entered into a separate written contract with The Richards Group.  *Id.*

**C.**     **Brock Represented Copyrighted Material As Original To The Richards Group And Failed To Indemnify It When The Copyright Owner Promptly Sued The Richards Group And One Of Its Most Important Clients.**

On or about September 8, 2003, The Richards Group hired "Jeffrey Brock *and* Brock Music, Inc." to provide original music to be used in a Travelocity advertising campaign being created by The Richards Group.[2]  As the customary practice, the parties entered into a written Music Services/Recording Purchase Agreement with an accompanying Music Rights Agreement ("Contract").  Stip. ¶ 2 (A 6); Agreed Exhibit List (A 12); Contract (A 15-22); Brock Dep. at 72

---

[2] The Stipulation states that "The Richards Group hired Jeffrey Brock and Brock Music, Inc. (collectively hereinafter referred to as 'Brock Music') to provide original music to be used in a Travelocity advertising campaign."  Stip. ¶ 1 (A 6).  Accordingly, the Court should attribute all stipulations contained therein to Brock individually and to BMI.

("Q.  Is this contract similar to other contracts you had entered with The Richards Group?  A. Yes.") (A 162).  In accordance with the Contract, Brock composed what he represented and warranted was a piece of original music never before published or exploited in any form anywhere in the world ("Composition").  Stip. ¶¶ 8-9 (A 7); Music Rights Agreement § 2(a), (c) (A 20).

Brock represented and warranted in the Contract with The Richards Group that the Composition did not and would not infringe upon or violate the copyrights or any other rights whatsoever of any person or entity.  Stip. ¶ 11 (A 7); Music Rights Agreement § 2(d) (A 20).  Pursuant to § 3 of the Music Rights Agreement and § 10 of the Music Services/Recording Purchase Agreement, Brock stipulated that:

> Brock Music agreed to defend, indemnify, and hold harmless, The Richards Group, Travelocity, and their respective officers, directors, associated or affiliated companies, successors, assigns, licensees, and any and all persons who made use of the Composition with the consent of The Richards Group and/or Travelocity ("Indemnitees") from and against any and all liabilities, damages, costs, charges, recoveries, judgments, penalties, expenses or losses of whatsoever kind or nature, including reasonable attorneys' fees and disbursements, which may be obtained against, imposed upon or suffered by the Indemnitees by reason of any breach by Brock Music of any of its warranties or representations, or any infringement or claim of infringement of copyrights, or violation or claim of violation of any other rights resulting from use of the Composition made by the Indemnitees.  Stip. ¶ 12 (A 7-8), ¶ 1 (defining Brock and BMI collectively as "Brock Music") (A 6).

The Richards Group reasonably relied on the representations and warranties made by Brock and paid BMI $58,000 for the Composition.  *Id.* ¶ 15 (A 8).  Brock admits that at the time he signed the Contract, BMI did not have the resources to indemnify an infringement claim.  Brock Dep. at 76 (A 163).

In addition to the $58,000 The Richards Group paid to BMI for the Composition, Brock claims to have personally retained half of its publishing rights.  Although Brock could have

assigned his publishing rights to BMI for the compositions he prepared during the course of employment, he "never did."  Brock explained his personal interest in the publishing rights for the Composition at his deposition:

> A.  [I]f this were to air long enough for ASCAP or BMI to collect monies, royalties monies on it . . . then The Richards Group and Brock Music, Inc. would have split the publishing portion of those royalties, and any composer royalties would go to the composer as an entity.
>
> Q.  In this case, BMI?
>
> A.  No.  That would be me personally, but that's an ASCAP thing.  It has nothing to do with Brock Music, Inc.
>
> Q.  Okay.  For projects that you composed, that Jeff Brock, in his individual capacity, composed for BMI --
>
> A.  Uh-huh.
>
> Q.  -- under this ASCAP arrangement procedure that you're talking about, royalty payments for the composer would go to Jeff Brock individually?
>
> A.  Yes, unless I had assigned it to Brock Music, Inc., which I never did.
> *Id*. at 57-59 (A 159).

Thus, at the time the Contract was entered, Brock personally stood to reap royalties from the use of the Composition contemplated by Plaintiff.  Brock still uses the very Travelocity spots at issue on his personal reel and advertises them on BMI's website to this day as "Jeff Brock: Composer's Video Reel."  Screen Captures of BMI's Website (file Look/commercial reel/Jeff Brock: Composer's Video Reel) (A 75).

Shortly after receiving the Composition, The Richards Group finalized the Travelocity spots and proceeded with the campaign.  From September 29, 2003, through October 13, 2003, the Composition aired nationwide on radio and television approximately 1500 times.  List of Spots Aired (identifying by media provider, *e.g.*, Westwood, NPR, XM, ESPN, TBS, TRAV, *etc*., approximately 402 radio spots and 1096 television spots) (A 23).

Before Brock could count his half of the publishing royalties, Travelocity received a "cease and desist" letter on November 3, 2003 regarding use of the Composition from EMI Catalogue Partnership ("EMI"), registered copyright owner of Elmer Bernstein's *The Great Escape March* from the 1963 motion picture "The Great Escape."  EMI Complaint ¶¶ 8, 13 (A 25-26, 27).  EMI sued The Richards Group and Travelocity for copyright infringement for using the Composition shortly thereafter, seeking damages in excess of $500,000 (the "Copyright Case").  *See generally, id.* (A 24-30).

Plaintiff put BMI on notice of the Copyright Case and provided BMI an opportunity to defend The Richards Group and Travelocity.  Stip. ¶ 20 (A 9).  Suffice to say, Brock is no Steve McQueen.  BMI refused to defend or indemnify The Richards Group or Travelocity.  *Id.* ¶ 21 (A 9).  Forced to defend the work of another, The Richards Group incurred approximately $30,000 in attorneys' fees and costs, and ultimately paid EMI $150,000 to settle the Copyright Case.  *Id.* ¶¶ 26-27 (A 9).  The Richards Group demanded that BMI reimburse it for the amounts paid to EMI to settle the Copyright Case and the attorneys' fees and costs incurred therein; BMI refused. *Id.* ¶ 28 (A 9).

D.      **The Richards Group Prevails In Arbitration Against BMI In Texas.**

Accordingly, The Richards Group initiated arbitration against BMI (the "Arbitration").  Brock is the signatory on the Contract.  Contract (A 18).  The Contract provided that any controversy or claim arising out of or relating to the Contract or any breach thereof shall be determined and settled by arbitration in Texas.  Stip. ¶ 29 (A 9); Music Services/Recording Purchase Agreement § 12 (A 17); Music Services Agreement ¶ 6 (A 21).   In addition, the Contract provides specifically that:

> This Agreement and all matters or issues related thereto shall be governed by and construed in accordance with the laws of the state of Texas applicable to contracts made and performed entirely therein.  All parties

further agree that proper and convenient venue lies within the court of the
State of Texas.  Music Services/Recording Purchase Agreement § 12(b)
(A 17); Music Services Agreement ¶ 6 (A 21).

The counsel currently representing Brock and BMPI represented BMI throughout the Arbitration process.  Welton Decl. ¶¶ 4-5 (A 193-94).  Counsel for BMI personally appeared at the Arbitration, as did Brock, who testified in person on behalf of BMI.  *Id.*

The Award of the Arbitrator was issued on December 13, 2005, awarding The Richards Group $180,000.00 (plus pre-judgment interest on this amount from December 1, 2004 to December 13, 2005, at a rate of 5% per annum), an additional $25,000.00 for The Richards Group's attorneys' fees related to the Arbitration, $2,988.72 as reimbursement to The Richards Group for arbitration fees and expenses incurred, and post-judgment interest on all of the above sums at a rate of 5% per annum commencing thirty days from the date of the Award until paid in full ("Arbitration Award").  Arbitration Award (A 31).  The Arbitration Award also enjoined BMI "from using the Composition, which, for the purposes of this injunction, includes 'Escape,' 'Travel Junkies,' and 'Wanderlust,' in any form or capacity, including, but not limited to, the uses currently exhibited on Brock's websites."  *Id.*  BMI refused to satisfy the Arbitration Award and still maintains the 'Escape,' 'Travel Junkies,' and 'Wanderlust,' spots on BMI's website under the heading "Jeff Brock: Composer's Video Reel" as of the date of this response.  Screen Captures of BMI's Website (file Look/commercial reel/Jeff Brock: Composer's Video Reel) (A 75); Welton Decl. ¶ 6 (A 194-95).

**E.**     **Brock Forms BMPI To Evade The Judgment And Usurps Assets And Opportunities Of BMI For His Personal Benefit.**

On December 28, 2005, The Richards Group filed an action in County Court at Law No. 1, Dallas County, Texas, against BMI to enforce the Arbitration Award ("Suit to Enforce"). Brock admits he was aware of the suit to enforce the Arbitration Award and made a "business

decision" not to participate "based on [his] attorney's advice."  Brock Dep. at 134 (A 178); e-mail from G. Harper to J. Welton (Feb. 21, 2006) (A 220).  On February 28, 2006, Plaintiff obtained a Final Judgment in the amount of $220,831.40 against BMI, which is accruing interest. Final Judgment (A 40).

On February 17, 2006 – a week before The Richards Group obtained the Final Judgment – Brock incorporated Brock Music Productions, Inc., which is virtually identical to the original name of BMI.  Charter of Brock Music Productions, Inc. (A 59); Brock Dep. 12-14 (A 147-48). In the Declaration of Jeffrey S. Brock in Support of the Motion to Dismiss, Brock swears that although there is common ownership "BMPI has no affiliation with Brock Music, which is a company that produces music for advertisements *and films*."  Brock Decl. ¶ 7 (May 10, 2006) (emphasis added) ("Brock Decl.").  Like BMI, however:

(a)     BMPI's principal place of business is the Recording Studio and it uses 615-298-2200 as its phone number.  Charter of Brock Music Productions, Inc. (A 59); Brock Dep. 9, 24, 59-60 (A 147, 150, 159).

(b)     Brock is the President, Chairman, and sole shareholder of BMPI and makes all day-to-day operating decisions.  *Id.* at 9-10, 13-14, 59, 70 (A 147, 148, 159, 162).

(c)     Brock's wife, Joan, is the only other officer or director of BMPI, although "she doesn't have a whole lot of duties" and never "really" provided any services.  *Id.* at 14, 50-51, 99-100 (A 148, 157, 169).

(d)     Collin Peterson, the recording engineer at the Recording Studio, was the only employee other than Brock.  *Id.* at 19, 63 (A 149, 160).

(e)     BMPI received interest-free "loans" from Brock with no fixed payment terms.  *Id.* at 20-23, 66-67 (A 149-50, 161).

(f)     BMPI pays no rent (BMI stopped paying rent in 2004).  *Id.* at 24, 62, 102 (A 150, 160, 170).

BMPI has no website.  *Id.* at 18 (A 149).  BMPI uses BMI's phone number, but pays no phone bills.  *Id.* at 18, 26 (A 149, 151).  BMPI has never had any clients, has none of its own recording

equipment, and says it has never used the recording equipment at the Recording Studio.  *Id.* at 40, 65 (A 154, 161).  BMPI did, however, call on BMI's clients and contacts for business using BMI's office equipment and customer lists.  *Id.* at 17-18 (A 149).

February 28, 2006 – the date the Final Judgment was entered – was the last time BMI had employees and the last date Brock paid himself and his recording engineer a salary from BMI. *Id.* at 68 (A 161).  Brock has performed no work for BMI since February 28, 2006.  *Id.*  Effective August 21, 2006, the State of Tennessee administratively dissolved BMI for failing to file its Annual Report.   Certificate of Administrative Dissolution (A 58).   Brock, however, has continued to maintain BMI's website, which still contains the Travelocity spots he is enjoined from using under the heading "Jeff Brock: Composer's Video Reel," among other references. Screen Captures of BMI's Website (file Look/commercial reel/Jeff Brock: Composer's Video Reel, Listen/music/acoustic music/Travelocity medley) (A 75); Welton Decl. ¶ 6 (A 194).

Beginning March 1, 2006, Brock began paying himself and the recording engineer from BMPI.  Brock Dep. at 15, 19 (A 148, 149).  To form BMPI and pay for those salaries, Brock "loaned" BMPI approximately $30,000 he had received and deposited into a personal account for scoring the music for the film "No Regrets" and "a couple smaller projects."  *Id.* at 20-23 ("Q. Okay.  You previously testified that there was some money already in this company –  A.  Uh-huh.    Q.  – at the time you incorporated it from a previous movie score? A. Yes.    Q. What movie was that?  A.  No Regrets.    Q.  . . . And do you recall approximately how much money there was in that company?  A.  Maybe – maybe $30,000. . . .    Q.  Then Jeff Brock, in your personal capacity, lent approximately $30,000 to BMPI?  A.  Right.    Q.  The source of that fund – of those funds was from a previous movie score –  A.  Yes.    Q.  – that you had done?  A.  And a couple of smaller projects.    Q.  And is that $30,000 – was that $30,000 loan done all at one

time?  A.  That – that funding was, yes.") (A 149-150).  The "loan" was interest-free with no fixed terms.  *Id*. 20-23, 66-67 (A 149-50, 161).[3]

When asked to describe BMPI's business, Brock testified at deposition that it "is a company that [he] write[s] for as a composer of musical scores for film and [] as a producer or writer for records."  *Id*. at 9 (A 147).  Comparatively, Brock testified at deposition that BMI, on the other hand, merely produced "advertising music."  *Id*.  However, as noted above, the Brock Declaration swore that BMI produced "music for advertisements *and films*."  Brock Decl. ¶ 7.  BMI's website also stresses its experience and talents in scoring films:

> After over 20 years in the advertising and film music business, Brock Music has the experience needed to deliver exactly what you want . . . .
>
> The fact that agencies and film producers rely on us for the best in acoustic work is no coincidence . . . .
>
> Jeff bought Nashville Sound in 1979 and formed the core of what became Brock Music, Inc., a company specializing in music for advertising and film. . . .
>
> Scoring to film is a specialty of Brock Music.  Screen Captures from BMI Website (A 75).

Tellingly, for Brock to score the music for "No Regrets" and "other smaller projects," he would have needed to use the recording equipment at the Recording Studio.  Brock Dep. at 39-40 (A 154).  BMI owns the recording equipment at the studio and paid the salary of the recording engineer (and Brock) through February 2006.  *Id*. at 15, 19, 39-40, 55-56 (A 148-49, 154, 158);

---

[3]  Brock admits that he "loaned" BMI funds "interest free" and that he "loaned" BMPI the $30,000 in a personal account he transferred to BMPI.  Brock Dep. at 20-24, 66-67 (A 150, 161).  Brock testified that these interest free loans are documented in the form of promissory notes.  *Id*. at 17, 20-24 (A 149-50).  However, Brock has failed to produce any documentation evidencing the loans and a plethora of other corporate records responsive to discovery.  *See, inter alia*, Welton Decl. ¶ 12 (A 196).  Brock also admits that it is his responsibility to keep records for BMI and BMPI, and that he in fact has documents responsive to discovery in Defendants' and BMI's possession, custody, or control that he has not bothered to produce.  Brock Dep. at 43, 59, 71-72, 100-01, 147-48 (A 155, 159, 162, 170, 181).  The Court should also note that BMI did not object to the subpoena served on it or otherwise seek a protective order, and has therefore waived any objections to the subpoena duces tecum.  *See* Subpoena Duces Tecum to BMI (A 129-44).

Screen Captures from BMI's Website (files Look/technical specs) (A 75).  BMI has also paid all the property taxes on the Recording Studio from 1989 through 2005.  Brock Dep. at 107 (A 171).  The film "No Regrets" was released in 2004.  Welton Decl. ¶ 8 (A 195).

Before Brock "loaned" BMPI the $30,000, BMI's bank accounts were swept by the State of Tennessee for back taxes.  Brock Dep. at 64 (A 160).  It is reasonable to infer from the evidence that the $30,000 Brock received for scoring "No Regrets" was owed to BMI, but nonetheless deposited by Brock into a personal account he then "loaned" to BMPI, which in turn paid him and the recording engineer's salaries beginning in March 2006.

After Plaintiff discovered the formation of BMPI, it brought the present suit against Brock and BMPI in April 2006.  Complaint (A 76-84).  As of June 30 2006, BMPI had paid Brock and the recording engineer all the funds "loaned" to it from Brock.  Then, BMPI too became "basically functionless" and "has no income."  Brock Dep. at 15 (A 148).

When BMI's business "tapered off" in mid-2004, Brock began to rent the Recording Studio and use of the recording equipment to the general public via another sole proprietorship he calls "Creative Caffeine."  As Brock describes it:

> A.  Creative Caffeine is a sole proprietorship.  It is owned strictly, solely by me.
>
> Q.  What is that business?
>
> A.  That's the studio.
>
> Q.  What do you mean by that?
>
> A.  That's the operations, the studio operations, the ability to lease the building out or lease the -- on a daily basis. . . . They use the services of the studio.  *Id.* at 102 (A ).

The recording equipment at the Recording Studio is owned by BMI. *Id.* at 55-56 (A 158); Screen Capture of BMI's Website (files Look/technical specs, Look/virtual tour); *compare with* the "Virtual Tour" and "Equipment" from Creative Caffeine's website (A 75, 200-18).

Further, Brock did not begin paying for the recording engineer's salary directly until July 2006. Prior to that time, BMI paid 100% of the recording engineer's salary up to February 28, 2006, at which point BMPI paid the recording engineer's salary with the funds Brock "loaned" to BMPI from the proceeds of the score for "No Regrets." Brock Dep. at 19 (A 149).

The very files used for BMI's website are also used by Brock in Creative Caffeine's website. When asked whether some components of the two websites were identical, Brock responded "I can't remember, but it's probably awful doggone close." *Id.* at 137 (A 179).

Although BMI owns the recording equipment, leased the Recording Studio from Brock, paid Brock's property taxes on the Recording Studio, and paid the salary of the recording engineer, *inter alia*, Brock has remitted <u>no</u> remuneration to BMI from the operation of Creative Caffeine. *Id.* at 104-05 (A 170-71). When bills are owed, Brock testified that:

> A. . . . Honestly, it doesn't matter. It's whoever is paying them. It doesn't matter whose name it's in. . . . I am not sure I can even tell you what it is. There is – they send them in so many different names. . . . Brock Dep. at 105 (A 182).

To this day, Brock still uses <u>Brock@BrockMusic.com</u> as his "main e-mail address" for all his personal and business matters. *Id.* at 131 (A 177).

## <u>SUMMARY OF ARGUMENT</u>

The evidence submitted makes a *prima facie* showing that Brock and BMPI have sufficient minimum contacts with Texas. <u>First</u>, under a variety of veil piercing theories, such as alter ego, sham, and single business enterprise, the contacts of BMI with Texas should be attributed to Brock and BMPI for personal jurisdiction. <u>Second</u>, Brock's personal interests in the

Contract and the personal stipulations from the Arbitration give rise to specific jurisdiction. Because the exercise of personal jurisdiction over Brock and BMPI in this case does not offend traditional notions of fair play and substantial justice, the Court should deny Defendants' motion.

## ARGUMENT

### A.    The Applicable Standards.

A federal court with diversity jurisdiction may exercise personal jurisdiction over a nonresident defendant to the same extent permitted by the state law of the forum. *See Alpine View Co., et al. v. Atlas Copco AB, et al.*, 205 F.3d 208, 214 (5th Cir. 2000). The Texas long-arm statute has been determined to have the same scope as the Constitution. *See id.* Accordingly, the question before the Court is whether exercising jurisdiction over Brock and BMPI is consistent with the Due Process Clause of the Fourteenth Amendment. *See id.* The Due Process Clause permits the exercise of personal jurisdiction over a nonresident defendant when (1) defendant "purposefully avail[ed] himself of the benefits and protections of the forum state by establishing 'minimum contacts'" and (2) the exercise of personal jurisdiction over that defendant does not offend "traditional notions of fair play and substantial justice." *See id.* at 215; *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 296 (1980).

"Minimum contacts" can be established through contacts sufficient to assert specific jurisdiction, or contacts sufficient to assert general jurisdiction. *See Alpine View Co.*, 205 F.3d at 215. Specific jurisdiction exists where a defendant has purposefully directed its activities at the forum state and the "litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984)). General jurisdiction can be established where defendant's contacts with the forum state, although not related to plaintiff's

cause of action, are "continuous and systematic." *See Helicopteros,* 466 U.S. at 415-16; *Alpine View Co.*, 205 F.3d at 215.

Courts look at a variety of factors to determine whether the exercise of personal jurisdiction over a non-resident defendant offends "traditional notions of fair play and substantial justice."  The factors typically considered are:  (1) the burden on the defendant; (2) the interests of the forum state; (3) plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of disputes; and (5) the shared interests of the several states in "furthering fundamental substantive policies."  *See King v. Enterprise Leasing Co. of DFW*, 2006 WL 784885, at *5 (N.D.Tex. 2006) (J. Fitzwater) (citing, *inter alia*, *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113 (1987)).  Once minimum contacts are found, however, courts rarely find the exercise of personal jurisdiction to be fundamentally unfair because the non-resident defendant must establish a "compelling case" to warrant such a finding. *See Rudzewicz*, 471 U.S. at 472; *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 211 (5th 1999); *Engel v. W.R. Berkely Corp.*, 2001 WL 238113, at *4 (N.D. Tex. 2001) (Sanders, Senior J.).

Where no hearing is held, plaintiff must present sufficient facts to make out only a *prima facie* case supporting jurisdiction.  *See Alpine View Co.*, 205 F.3d at 215.  The Court may consider all the submissions of the parties, such as pleadings, affidavits, interrogatories, depositions, exhibits, any part of the record, and any combination thereof.  *See Wyatt v. Kaplan*, 686 F.2d 276, 280 (5th Cir. 1982); *Ingenious Investments, Inc. v. Bombart*, 2006 WL 1582080, at *1 (N.D.Tex. 2006) (slip op.).  The Court must accept as true all of plaintiff's uncontroverted factual allegations, and must resolve all factual conflicts raised by the parties' submissions in favor of plaintiff.  *See Wyatt*, 686 F.2d at 280.

**B.     The Court Has Personal Jurisdiction Over BMI And Should Attribute Its Contacts To Brock And BMPI.**

The Complaint seeks to pierce the veil of BMI and hold Brock and BMPI liable for the Judgment obtained against BMI by The Richards Group.  *See generally* Complaint (A 76-84).[4] Notably, "the piercing-the-corporate veil test for attribution of contacts, *i.e.*, personal jurisdiction, 'is less stringent than for liability.'"  *Bombart*, at *3; *Berry v. Lee*, 428 F. Supp. 2d 546, 556 (N.D.Tex. 2006) (J. Fitzwater) ("Berry's burden of demonstrating a *prima facie* case of personal jurisdiction through alter ego and single business enterprise theories is 'less stringent' than the standard she must meet at trial of proving alter ego or single business enterprise liability.").  Because disregarding the corporate fiction is an equitable doctrine, courts take a flexible fact-specific approach focusing on equity.  *Castleberry v. Branscum*, 721 S.W.2d 270, 273 (Tex. 1986).

**1.     The fiduciary shield doctrine is inapplicable.**

While the general rule is that jurisdiction over an individual cannot be predicated upon jurisdiction over a corporation (the fiduciary shield doctrine), courts have recognized an exception to this rule when the corporation is the alter ego of the individual or otherwise subject to various veil-piercing theories.  *See, inter alia*, *Stuart, et al. v. Spademan*, 772 F.2d 1185, 1197

---

[4]  It is undisputed that the Court has personal jurisdiction over BMI.  The Contract between The Richards Group and BMI was entered in Texas and contains a venue clause subjecting BMI to binding arbitration in Texas. Pursuant to the terms of the Contract, The Richards Group and BMI litigated the indemnity issue via binding arbitration in Dallas, Texas.  Brock personally attended the Arbitration and testified on behalf of BMI, which was represented by the counsel currently representing Brock and BMPI in this litigation.  The Richards Group prevailed at Arbitration and was awarded, *inter alia*, the damages BMI's breach of the Contract caused The Richards Group. BMI knowingly allowed The Richards Group to reduce the Arbitration Award to a Final Judgment in Texas.

Half of BMI's business for the last five years has been with The Richards Group.  BMI has done "dozens" of projects with The Richards Group in that time frame, each of which was subject to a similar written contract. Business with The Richards Group generated approximately $250,000 in revenue for BMI and was utilized by BMI to further promote and solicit business for BMI.  In addition to The Richards Group, BMI has approximately 12 other clients in Texas.  Because more than half of BMI's business is in Texas, Brock continuously and systematically traveled to Texas, and Dallas, in particular, to develop business for BMI and service its clients. Brock Dep. at 114-25 (A 173-76).

(5th Cir. 1985).  In these cases, courts attribute a corporation's contacts with the forum state to an individual defendant for jurisdictional purposes.  *Id.; Optimum Return LLC v. Cyberkatz Consulting, Inc.*, 2004 WL 827835, at *3 (N.D.Tex. 2004) (J. Fitzwater); *see also Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc.*, 519 F.2d 634, 638 (8th Cir. 1975).

As this Court noted in *Optimum Return LLC*, alter ego "is not the only exception" to the fiduciary-shield doctrine.  *Optimum Return LLC*, at *3.  In *Spademan*, the Fifth Circuit highlighted the following passage from *Holfield v. Power*, which upheld jurisdiction over the president-owner of a corporation, and articulated the exception as follows:

> Where, as in this case, there is an unmistakable identity of interest between the defendant and the corporation through which he acts, where that corporation has acted in a manner that brings it within a long-arm statute, and where significant forum state interest are involved in the cause of action, then disregarding the corporate entity to reach the defendant for the purpose of asserting the personal jurisdiction of the state courts over the defendant does not offend the due process requirements of the Constitution. *Spademan*, 772 F.2d at 1197-98 (quoting *Holfield v. Power*, 382 F. Supp. 388, 394 (D.Md. 1974)).

The court in *Holfield* attributed the contacts of the corporation to its majority shareholder, president, and member of the board, because it appeared from his deposition that he was "the guiding genius behind" the venture, he "guided its progress from his positions" and "brought it to an end."  *Holfield*, 382 F. Supp. at 393.

Similarly, this Court found the fiduciary-shield doctrine inapplicable in *Fowler v. Broussard* and attributed the corporation's contacts to particular shareholders and directors for the purposes of exercising personal jurisdiction because plaintiff introduced evidence that their conduct constituted a breach of fiduciary duty and usurpation of corporate opportunities.  *Fowler v. Broussard, et al.*, 2001 WL 184237, at *4 (N.D.Tex. 2001).  More recently, this Court found sufficient evidence to exercise personal jurisdiction under the single business enterprise theory in

*Berry v. Lee* because, *inter alia*, the companies' brochures, business cards, and websites all referred to the same general name, all conducted the same general business, and contained pictures of the same factory, which augmented the fact that the various entities were owned and controlled by the same person. *Berry*, 428 F. Supp. 2d at 555.

> **2.    Alter ego.**

Under Texas law,[5] the alter ego doctrine applies where there is such unity between the corporation and its individual shareholder that the separateness of the two has ceased and holding only the corporation liable would result in injustice. *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 593 (5th Cir. 1999) (quoting *Harwood Tire-Arlington, Inc. v. Young*, 963 S.W.2d 881, 885 (Tex.App. — Fort Worth 1998, writ dism'd by agr.). When the corporate privilege is abused, courts will disregard the corporate fiction and hold the parent company or shareholders liable. *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986); *Harwood Tire-Arlington, Inc. v. Young*, 963 S.W.2d 881, 885 (Tex.App. — Fort Worth 1998, writ dism'd by agr.).

Alter ego is demonstrated "by evidence showing a blending of identities, or a blurring of lines of distinction, both formal and substantive . . . ." *See Nichols, et al. v. Pabtex, Inc.,* 151 F. Supp. 2d 772, 781 (E.D.Tex. 2001). Inadequate capitalization is an "important consideration" and "indication that the company is a mere conduit or business tool." *See id.*; *see also Castleberry*, 721 S.W.2d at 271; *Harwood Tire-Arlington, Inc.*, 963 S.W.2d at 885. Evidence of undocumented or interest-free loans also supports a finding of alter ego. *See, e.g., Doe v. Unocal Corp., et al.*, 27 F. Supp. 2d 1174, 1188 (C.D.Cal. 1998). The rationale is simple: "if the

---

[5] While the issue of whether the corporate entity can be disregarded is determined by the law of the state of incorporation, which in this case is Tennessee, there does not appear to be any conflict between the law of Texas and Tennessee in this regard. *See* STEPHEN B. PRESSER, PIERCING THE CORPORATE VEIL § 2:47, CH. 2: STATE LAW ON PIERCING THE VEIL: TENNESSEE (Apr. 2006) (setting forth the current state of Tennessee law on piercing the corporate veil theories); *see also IBC Manuf. Co. v. Velsicol Chemical Corp., et al.*, 187 F.3d 635 (6th Cir. 1999); *Thomas, et al. v. Lytle, et al.*, 104 F. Supp. 2d 906 (M.D.Tenn. 2000).

shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect individual and corporate creditors." *Castleberry*, 721 S.W.2d at 273.

Most courts use a multifactor test concerned with "reality and not form, with how the corporation operated and the individual defendant's relationship to that corporation." *Nichols, et al.,* 151 F. Supp. 2d at 781. The factors set forth in *United States v. Jon-T Chemicals, Inc.* (the "*Jon-T* factors") are a universal starting point. *United States v. Jon-T Chemicals, Inc.,* 768 F.3d 686, 694 (5th Cir. 1985). Virtually all of the applicable *Jon-T* factors are present in this case. Namely: (1) common ownership; (2) common directors/officers; (3) parent financed; (4) incorporated by parent; (5) undercapitalized; (6) parent pays salaries of company and other expenses; (7) parent uses subsidiaries property as its own; (8) daily operations are not kept separate; and (9) a connection between the parent's employee, officer, and director, and the subsidiary's tort or contract giving rise to the suit. *See id.*

In *Harwood Tire-Arlington, Inc.*, the court found evidence similar to the evidence in the present case to be legally and factually sufficient to support jury findings that disregarded the corporate fiction. Specifically, the court found that:

> Before the reorganization, Frank Roszell owned 100% of HTI's stock and was its sole director. After the reorganization, Roszell owned 100% of HTI's stock and was the sole director of all subsidiaries. . . . Assets of the subsidiaries were exchanged between the companies through intercompany transfers. When Harwood Arlington, Inc. was closed, some equipment and employees were transferred from the Arlington store to other subsidiaries. Roszell testified that he did not know if other subsidiaries paid for the equipment received from Harwood Arlington, Inc. . . . The evidence shows that Harwood Arlington, Inc. was operated as a mere tool of HTI and that there was no separateness between the two. *Harwood Tire-Arlington, Inc.*, 963 S.W.2d at 887.

Brock did all of these things.[6]

In *Lakota*, the Eighth Circuit upheld a jury finding that the corporation was the alter ego of its sole shareholder based on evidence strikingly similar to the present case.   Namely, the Eighth Circuit relied on the fact that (1) the individual was and had always been the sole shareholder and sole incorporator, (2) that he alone made loans to and borrowed from the corporation, and (3) that he and his wife owned the building housing the company and received rental payments.  *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc.*, 519 F.2d 634, 638 (8th Cir. 1975).

### 3.   Sham.

To prove there has been a sham to perpetrate a fraud, tort claimants and contract creditors must show only constructive fraud.  *Castleberry*, 721 S.W.2d at 273.  The court in *Archer v. Griffith* distinguished actual fraud from constructive fraud:  "Actual fraud usually involves dishonesty of purpose or intent to deceive, whereas constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interest."  *Id.* (quoting *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964).  In the present case, there is evidence that Brock has breached fiduciary duties owed to BMI and usurped corporate assets and opportunities of BMI for his own personal benefit and that of BMPI.  Namely, *inter alia*, personally retaining funds from scoring "No Regrets," personally retaining funds from renting the Recording Studio and use of the recording equipment, and reallocating other BMI resources to personal endeavors.

---

[6]  Brock and his wife were the sole directors of BMI and BMPI.  He was the sole owner of BMI and BMPI. He rents out the Recording Studio, which is leased to BMI, and use of the recording equipment, which is owned by BMI, but does not remit the revenue to BMI from those endeavors.  He makes undocumented, interest-free loans to BMI and BMPI, which he then uses to pay himself and his recording engineer salaries.  Using the Recording Studio and equipment, he scores music for films, which is the stated business purpose of BMI and has been for more than 20 years, but deposits the revenue received into a personal account.  All the while causing BMI and BMPI to pay for the property taxes and other expenses related to the operation of the Recording Studio.

4.      __Single business enterprise.__

The single business enterprise doctrine applies when two or more business entities act as one.  *See Nichols,* 151 F. Supp. at 781.  Under the doctrine, "when corporations are not operated as separate entities, but integrate their resources to achieve a common business purpose, each constituent corporation may be held liable for the debts incurred in pursuit of that business purpose."  *Id.*  Like the alter-ego doctrine, "the single business enterprise doctrine is an equitable remedy, which applies when the corporate form is 'used as part of an unfair device to achieve an inequitable result.'"  *Id.*  Again, virtually all of the factors considered by courts in determining whether businesses should be treated as a single business enterprise are present in this case, namely:  (1) common directors, officers, and employees; (2) payment of wages by one corporation to another corporation's employees; (3) common business names; (4) services rendered by employees of one corporation on behalf of another corporation; (5) undocumented transfers of funds between corporations; and (6) unclear allocation of profits and losses.  *Id.*

As this Court previously noted, Texas courts utilize the singe business enterprise theory as a basis for asserting personal jurisdiction over nonresident defendants.  *Berry*, 428 F. Supp. 2d at 553-54.  Again, the standard applied for personal jurisdiction is less than that which is applied for liability purposes.  *Id.* at 556; *El Puerto de Liverpool S.A. de C.V. v. Servi Mundo Llantero S.A. de D.V.*, 82 S.W.3d 622, 634 (Tex.App.2002, pet dism'd w.o.j.).  Sharing a common business name, common offices, common employees, and services rendered by employees of one corporation on behalf of the other are sufficient to support a finding of *in personam* jurisdiction under a "single business enterprise" theory.  *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec, et al.*, 2005 WL 822911 (W.D.Tex. 2005); *El Puerto de Liverpool S.A. de C.V.*, 82 S.W.3d at 637.

**C.    Brock's Personal Interests Arising Out Of And Related To The Contract Give Rise To Specific Jurisdiction Over Him.**

Independent of BMI, Brock's personal interests arising out of and relating to the Contract give rise to specific jurisdiction over him. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).    First, Brock had a personal interest in royalties from publishing rights of the Composition, which aired nationwide before being cut short by the Copyright Case.  Brock Dep. at 57-59 (A 159).  Second, Brock used the Travelocity spots to promote and advertise himself personally as a composer.  Screen Captures for BMI Website (files Lean/creating/jeffbrock, Look/commercial reel/Jeff Brock: Composer's Video Reel) (A 75).  In fact, Brock has continued to do so for more than a year after being enjoined from doing so under the Arbitration Award.  Welton Decl. ¶¶ 6-7 (A 194-95); Screen Captures from BMI Website (A 75); Arbitration Award (enjoining use of the "Escape," "Travel Junkies," and "Wanderlust" materials) (A 31).

Finally, Brock entered into the Stipulation, the facts from which give rise to personal jurisdiction.  Paragraph 1 of the Stipulation states:

> The Richards Group hired Jeffrey Brock *and* Brock Music, Inc. (collectively hereinafter referred to as 'Brock Music') to provide original music to be used in a Travelocity advertising campaign.  Stip. ¶ 1 (emphasis added) (A 6).

Each reference to "Brock Music" in the Stipulation therefore includes Brock.  Because this litigation arises from the Arbitration and use of the Composition, Brock's personal interest and use of the Travelocity spots to advertise and promote himself are sufficient for the Court to find sufficient jurisdiction over Brock.

**D.    Exercising Personal Jurisdiction Over Brock and BMPI Does Not Offend Traditional Notions Of Fair Play And Substantial Justice.**

There is no evidence establishing that the exercise of personal jurisdiction over Defendants in this case is fundamentally unfair.  The only evidence submitted by Defendants on

this point is the Brock Declaration, which asserts conclusory allegations that it would be "extremely burdensome and expensive" for Defendants' to litigate this dispute in Texas and that "most of the witnesses" Defendants would "need to use at trial reside in the State of Tennessee." Brock Decl. ¶¶ 17, 23.  These allegations do not present a "compelling case" for Defendants' contention.  *See Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 208 (5th Cir. 1996); *Berry*, 428 F. Supp. 2d at 553-54.

In *Wien Air Alaska*, the Fifth Circuit rejected the same argument made by the nonresident defendant who was located in Germany, explaining that "once minimum contacts are established, the interests of the forum and plaintiff justify even large burdens on the defendant."  *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 211 (5th 1999).  Tellingly, BMI was prepared to call "three or four" witnesses during Arbitration, which it anticipated would be 2-3 days.  Welton Decl. ¶ 5 (A 194).  One of those witnesses was Brock, who appeared and testified without "extreme burden and expense."  *Id.*  In fact, while Brock was in Texas for the Arbitration, he visited friends and clients.  Brock Dep. at 118-19 (174).

Traditional notions of fair play and substantial justice are not offended by exercising personal jurisdiction over Defendants in this case.  *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d at 211.  What, if any, burden on Defendants is minimal.  Defendants have able Texas counsel that litigated the Arbitration on behalf of BMI in Dallas, Texas, and are familiar with the underlying issues.   Welton Decl. ¶ 4-5 (A 193-94).   Aided by his Texas counsel, Brock personally attended and testified at the Arbitration.  *Id.*  For more than twenty years, Brock has made regular trips to Texas, and Dallas, in particular, to develop business, service clients, and see family and friends.  Brock Dep. at 32, 114-125 (A 152, 173-76).  Brock also attended college at ACU, is a "distinguished alumni," recently judged a music competition on campus, and still

maintains an active relationship with his alma mater. *Id.* at 70, 124-25 (A 162, 175-76); ACU Brochure (A 72-74). After "dozens" of projects with The Richards Group with similar clauses mandating venue for disputes in Texas, it was foreseeable to Brock that he could be called upon to litigate issues related to his business dealings in Texas.

Texas has an interest in protecting its corporate citizens and providing Plaintiff convenient and effective relief. Both parties would be burdened by having to obtain Tennessee counsel and duplicating the time and energy invested by Texas counsel to date. The Texas judiciary has an interest in efficiently resolving this dispute, as BMI and The Richards Group agreed to a Texas forum and utilized its arbitration procedures and courts for enforcement. There are no fundamental substantive policies that are in conflict between Texas and Tennessee law in this case. With nothing more than conclusory allegations of burden from Defendants, the Court should find that exercising personal jurisdiction over Defendants in this case would not offend traditional notions of fair play and substantial justice. *See King v. Enterprise Leasing Co. of DFW*, 2006 WL 784885, at *5 (N.D.Tex. 2006) (J. Fitzwater) (citing, *inter alia*, *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113 (1987)).

## **REQUEST FOR RELIEF**

Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, and grant whatever further and other relief the Court deems necessary and just.

Dated:  January 12, 2007

Respectfully submitted,

LACKEY HERSHMAN, L.L.P.


By:  /s/  Jamie R. Welton
        Jamie R. Welton
        State Bar No. 24013732
        Scott S. Hershman
        State Bar No. 00793205

3102 Oak Lawn Avenue, Suite 777
Dallas, Texas  75219-4241
Telephone:    (214) 560 2201
Telecopier:    (214) 560 2203

**ATTORNEYS FOR DEFENDANT
THE RICHARDS GROUP, INC.**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on the 12th day of January, 2007, a true and correct copy of the foregoing document has been served via the Electronic Filing System.  Courtesy copies have also been provided to the Honorable Sidney A. Fitzwater and Geoffrey S. Harper, Fish & Richardson P.C., 1717 Main St., Suite 5000, Dallas, TX  75201, via hand delivery.

/s/  Jamie R. Welton
Jamie R. Welton