IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE RICHARDS GROUP, INC.,           §
                                    §
                Plaintiff,          §
                                    §  Civil Action No. 3:06-CV-0799-D
VS.                                 §
                                    §
JEFFREY S. BROCK, et al.,           §
                                    §
                Defendants.         §

<u>MEMORANDUM OPINION</u>

Plaintiff The Richards Group ("TRG") sues defendants Jeffrey S. Brock ("Brock") and Brock Music Productions, Inc. ("BMPI") for a declaration that BMPI and Brock are the alter egos of Brock Music, Inc. ("BMI"), a company against which TRG is a judgment creditor, that all three are a single business enterprise, and that BMPI and Brock are jointly and severally liable for the judgment that TRG has against BMI. TRG also seeks judgment declaring that various transfers among Brock, BMI, and BMPI were fraudulent and void. Following a bench trial, and for the reasons that follow,[1] the court finds in favor of TRG on its claim that Brock and BMPI are the alter egos of BMI, that all three are a single business enterprise, and that BMPI and Brock are jointly and severally liable for the judgment. The court, in its discretion, declines to grant declaratory relief on TRG's fraudulent transfer claims.

---

[1]The court sets out in this memorandum opinion its findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a).

In September 2003 TRG, a national advertising agency, hired BMI to provide original music ("the composition") for an advertising campaign that TRG was creating for Travelocity. TRG and BMI entered into a Music Services/Recording Purchase Agreement with an accompanying Music Rights Agreement ("Rights Agreement"). In the Rights Agreement, BMI warranted that it was the sole author of the composition, that the composition was original, and that the composition would not infringe the copyrights of any other person or entity. EMI Catalogue Partnership ("EMI") later sued TRG and Travelocity for copyright infringement arising from their use of the composition in the Travelocity advertising campaign. BMI did not indemnify TRG, and in September 2004 TRG paid EMI $150,000 to settle the case.

In April 2005 TRG initiated an arbitration proceeding against BMI for breach of the Rights Agreement. On December 13, 2005 TRG obtained an award against BMI for over $200,000, covering TRG's settlement with EMI and its attorney's fees. On December 28, 2005 TRG filed suit in Texas state court to obtain a judgment enforcing the arbitration award. While the lawsuit was pending, but before judgment was entered, Brock filed a UCC-1 in his favor that covered essentially all of BMI's tangible assets. On February 17, 2006—also during the period that preceded the entry of judgment—Brock incorporated BMPI. TRG obtained a final default

judgment against BMI on February 28, 2006 for $220,831.40.  BMI has
yet to pay any part of the judgment.

II

TRG filed the instant lawsuit against Brock and BMPI in county
court in Texas, requesting declaratory relief.  Following removal,
TRG filed an amended complaint in which it seeks to collect
attorney's fees and costs under Tex. Civ. Prac. & Rem. Code §
37.009 (Vernon 2008).   While TRG implicitly seeks declaratory
relief under the Texas Declaratory Judgments Act, Tex. Civ. Prac.
& Rem. Code Ann. §§ 37.001-37.011 (Vernon 2008), "[w]hen a
declaratory judgment action filed in state court is removed to
federal court, that action is in effect converted into one brought
under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201,
2202." *Redwood Resort Props., LLC v. Holmes Co.*, 2007 WL 1266060,
at *4 (N.D. Tex. Apr. 30, 2007) (Fitzwater, J.) (citing *i2 Techs.
US, Inc. v. Lanell*, 2002 WL 1461929, at *7 n.5 (N.D. Tex. July 2,
2002) (Fish, C.J.)).  Therefore, TRG's declaratory judgment claims
have been effectively converted to claims brought under the federal
Declaratory Judgment Act.

The federal Declaratory Judgment Act provides that, "[i]n a
case of actual controversy within its jurisdiction, . . . any court
of the United States, upon the filing of an appropriate pleading,
may declare the rights and other legal relations of any interested
party seeking such declaration, whether or not further relief is or

could be sought." 28 U.S.C. § 2201. Federal courts have broad discretion to grant or refuse declaratory judgment. *Torch Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991). "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). The Declaratory Judgment Act is "an authorization, not a command." *Pub. Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962). It gives federal courts the competence to declare rights, but it does not impose a duty to do so. *Id.*

## III

TRG seeks a declaration that BMPI and Brock are the alter egos of BMI and that all three are a single business enterprise. TRG also requests that the court declare that BMPI and Brock are jointly and severally liable for the state court judgment that TRG obtained against BMI.

### A

When a suit is removed to federal court based on diversity jurisdiction, district courts "apply the conflict of laws rule of the state in which it sits to determine which state's substantive law should be applied." *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 203 (5th Cir. 1995) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Texas law, "only the

laws of the jurisdiction of incorporation of a foreign corporation shall govern . . . the liability, if any, of shareholders of the foreign corporation for the debts, liabilities, and obligations of the foreign corporation for which they are not otherwise liable by statute or agreement." Tex. Bus. Corp. Act Ann. art. 8.02 (Vernon 2003). TRG seeks to pierce the corporate veils of BMI and BMPI, both of which are incorporated in the state of Tennessee. The court therefore applies Tennessee law in determining whether BMPI and Brock are alter egos of BMI. *See*, *e.g.*, *Alberto*, 55 F.3d at 204 (holding that, under Texas choice-of-law rules, Delaware law applied to plaintiffs' piercing claim because they sought to disregard the corporate form of a company incorporated in Delaware). Moreover, the parties do not dispute that Tennessee law controls in this respect.

B

"A corporation is presumptively treated as a distinct entity, separate from its shareholders, officers, and directors." *Oceanics Schools, Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003). "A corporation's separate identity may be disregarded or 'pierced,' however, upon a showing that it is a sham or a dummy or *where necessary to accomplish justice*." *Id.* (some internal quotation marks omitted) (emphasis in original). "The conditions under which the corporate entity will be disregarded vary according to the circumstances present in each case and the matter is

particularly within the province of the trial court." *Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985); *see*, *e.g.*, *Boles v. Nat'l Dev. Co.*, 175 S.W.3d 226, 244 (Tenn. Ct. App. 2005). "Generally, no one factor is conclusive in determining whether or not to disregard a corporate entity; rather, the courts typically rely upon a combination of factors in deciding such an issue." *Oceanics Schools*, 112 S.W.3d at 140 (internal quotation marks omitted) (citing *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991)). Tennessee courts rely on the factors annunciated in *FDIC v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984), in deciding whether to pierce the corporate veil. *See*, *e.g.*, *Boles*, 175 S.W.3d at 245-46; *Oceanics Schools*, 112 S.W.3d at 140.

> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality of business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing

> liability of another person or entity; and
> (11) the failure to maintain arms length
> relationships among related entities.

*Allen*, 584 F. Supp. at 397. "It is most important to note that it is not necessary that all of the *Allen* factors weigh in a plaintiff's favor in order to justify the piercing of the corporate veil." *Boles*, 175 S.W.3d at 246 (citing *Oceanics Schools*, 112 S.W.3d at 140-41). "Discarding the fiction of the corporate entity, or piercing the corporate veil, is appropriate when the corporation is liable for a debt but is without funds to pay the debt, and the lack of funds is due to some misconduct on the part of the officers and directors." *Id.* at 244 (citing *Muroll Gesellschaft M.B.H. v. Tenn. Tape, Inc.*, 908 S.W.2d 211, 213 (Tenn. Ct. App. 1995)). When a creditor of a company attempts to pierce the company's corporate veil to satisfy its claim against a shareholder, the creditor must show that the shareholder's control of the company proximately caused the creditor's inability to collect. *See Tenn. Racquetball Investors, Ltd. v. Bell*, 709 S.W.2d 617, 622 (Tenn. Ct. App. 1986). "The party wishing to pierce the corporate veil has the burden of presenting facts demonstrating that it is entitled to this equitable relief." *Oceanics Schools*, 112 S.W.3d at 140.

Since BMI's inception in 1979,[2] Brock has been the sole shareholder of BMI.  Since incorporating BMPI in February 2006, Brock has remained its sole shareholder.  During the existence of both companies, BMI and BMPI have had the same board of directors, Brock, and his wife Joan.  Brock has also served as Chairman of the Board of both companies.  BMI and BMPI also have the same two officers: Brock, who serves as President, and Joan, who serves as Secretary.  Brock has always directed the daily activities of BMI and BMPI.  Joan has very few duties at either company.  As long as both companies have existed, BMI and BMPI have used the same business office: a recording studio at 2937 Berry Hill Drive, Nashville, Tennessee 37204 ("recording studio").  In their individual capacities, Brock and Joan own the recording studio.  As long as BMPI has existed, it has used the same business telephone number as has BMI.

Other than Brock, BMI's sole employee during the relevant time period was Collin Peterson ("Peterson"), the sole employee of BMPI besides Brock.  Peterson has worked as an engineer for both companies.  BMI paid Peterson's salary until February 28, 2006, when BMI no longer had sufficient funds to continue doing so.  BMPI

---

[2]Over the years, BMI occasionally changed names.  The court notes these changes only where relevant to today's decision.

started paying Peterson's regular salary on March 1, 2006, in the same amount as BMI paid him. As of December 11, 2007, BMPI was still paying Peterson's salary. BMI paid Brock's regular salary until February 28, 2006, when BMI no longer had any money to continue paying it. BMPI started paying Brock's salary March 1, 2006, in the same amount as his BMI salary, until the end of June 2006, when Brock stopped receiving salary payments altogether. February 28, 2006 is the last day that BMI had employees.

Norman Rollins ("Rollins"), Esquire, a tax lawyer, has represented Brock for the past 30 years; he has also represented BMI and BMPI.[3] In the past ten years, he has signed off on all of BMI's and BMPI's tax returns. Rollins represented Brock and BMPI in the formation of BMPI in February 2006. Rollins assisted Brock in preparing and filing the UCC-1 that encumbered nearly all of BMI's assets.

B

The merits of TRG's alter ego claims largely hinge on the proper characterization of two bank accounts.

1

The first account at issue was at the National Bank of Commerce, in the name of "Jeffery S[.] Brock DBA Brock Musical

---

[3]Because the court is finding in favor of TRG, it need not decide TRG's objection to Rollins' testimony at trial on the basis of Rule 26.

Productions"[4] ("357 account").[5]  In June 2005 SunTrust Bank acquired the 357 account, and the account number remained the same.  In March 2006 the 357 account was transferred to the name of BMPI, but the account number did not change, and it remained at SunTrust Bank.

BMI held an account in its own name ("BMI account"), first at Bank of America, and then at Bank of Nashville, when it was moved there in October 2003.  From 2002 until April 2004, BMI did not use the 357 account, although the account existed even before 2002.  During this period, all invoices paid to BMI for BMI's professional services were deposited into the BMI account.  In April 2004, however, Brock began to deposit into the 357 account all incoming checks[6] payable to BMI for which BMI had rendered professional services.  Brock continued this practice until BMI transferred the 357 account to BMPI in March 2006.[7]  Brock conducted BMI's affairs this way because he wanted to keep most of BMI's money in the 357 account and to maintain a low balance in the BMI account.  Although Brock occasionally paid BMI's expenses from the 357 account during

---

[4]The Bank misspelled Brock's first name, which is correctly spelled "Jeffrey."

[5]The account number for this bank account ended with the numbers "357."

[6]These incoming checks were for as much as $50,000.

[7]Brock deposited incoming BMI checks into the 357 account as late as February 6, 2006, when he deposited over $20,000 of BMI's money into the 357 account.

the period from April 2004 and February 2006, he paid the vast majority of BMI's bills from the BMI account. To facilitate this arrangement, Brock wrote a check from the 357 account to the BMI account when BMI had bills to pay. This allowed the BMI account to maintain a relatively low balance.

Defendants characterize the 357 account, as it was before March 2006, as a bank account that belonged to BMI. They posit that the 357 account was merely a holding account for BMI. And they assert that the only monies deposited into the 357 account were BMI's, and that the only funds paid from the 357 account that accrued to Brock's personal benefit were salary payments that BMI was obligated to make. Moreover, defendants emphasize that, from April 2004 to March 2006, BMI paid taxes on the monies deposited into the 357 account.

These facts notwithstanding, the court finds that, before March 2006, the 357 account was a personal account that Brock owned individually. Although Brock maintained that the 357 account was not his personal bank account, he acknowledged that the account was in his name before it was transferred to BMPI in March 2006. Brock knew how to establish a bank account in the name of BMI, and BMI in fact had an account in its own name: the BMI account. Brock also acknowledged at trial that only he, in his individual capacity, not BMI, had the right to draw on the 357 account.

When asked during his October 26, 2006 deposition about the

initial funding of BMPI, Brock testified that it came from scoring the movie "No Regrets" for Filmhouse, Inc. ("Filmhouse"). On June 15, 2004 Brock deposited the $15,000 check from Filmhouse into the 357 account. This was the only check from Filmhouse compensating BMI for its work on "No Regrets." Throughout his deposition, Brock repeatedly testified that the "No Regrets" check was held in a *personal* bank account with SunTrust Bank.

In Brock's December 12, 2007 deposition, he was asked about the BMI account with the Bank of Nashville, which had a balance of $6,815.69 at the end of January 2006:

> Q.  At this time, roughly January of 2006, does Brock Music have any other accounts other than this Bank of Nashville account?
> A.  No.
> Q.  Is it fair to say, then, that the only funds that Brock Music had at its disposal at this time was the balance noted in this [BMI] account statement?
> A.  As far as I can remember . . . .
> Q.  But is it fair to say that, you know, as of January 31, 2006, the only funds that Brock Music, Inc. had at its disposal was the 6,815.69?
> A.  Yes.

Brock Dec. 12, 2007 Dep. 49:4-23. Brock thus denied that BMI had another bank account or even had other funds available to it at a time when BMI was using the 357 account as a "holding account" for all of BMI's incoming checks. Brock had deposited $11,518.06 of BMI's money into the 357 account on January 26, 2006, and he did not write any checks on the account from January 13, 2006 until

February 3, 2006.[8]

Brock's deposition testimony undermines the contention that the 357 account was simply a "holding account" for BMI's use. Although Brock testified at trial that he was mistaken in describing the BMI account as the only account that BMI owned as of January 2006, the court finds to be more credible his deposition testimony, which was given closer in time to the events in question and with less opportunity for revision as Brock became aware of the potential effect that his testimony might have on the merits of this lawsuit.

Moreover, notations that Brock made on checks written from the 357 account and deposited in the BMI account corroborate his initial characterization of the account as a personal one. Of the 20 checks that were written to transfer money from the 357 account to the BMI account, Brock wrote the word "loan" on the notation line of 18 of them. Brock acknowledged that he would not have written the word "loan" on these checks had he not thought that he was making a loan. He also admitted that BMI would not have needed to loan money to itself. Thus Brock's notations on these checks confirm that he understood the 357 account to be a personal account that he individually owned and controlled, not a BMI-owned account.

---

[8]The court is not able to determine the exact balance for the 357 account because the bank records that defendants produced do not establish this. TRG specifically requested this material in requests for production and a subpoena.

That BMI paid taxes on the income represented by checks deposited into the 357 account is not dispositive in determining the question of account ownership. Moreover, Rollins——BMI's tax lawyer who prepared BMI's tax returns during these years——testified at trial that he learned of the holding account arrangement only three weeks before trial. Thus Rollins' testimony that he had never seen any red flags related to the finances does not persuade the court to alter its findings regarding ownership of the 357 account. The court finds that, until March 1, 2006, when Brock transferred the 357 account into the name of BMPI, Brock owned the 357 account individually. BMI did not own it.

2

The second account at issue is the bank account that Brock used for renting out the recording studio ("CC account"). Bank of America originally held this account in the name of "Creative Caffeine, Jeffrey S[.] Brock." In late April 2006 Brock transferred the balance of the CC account to SunTrust Bank, which held the new account in the name of "Jeff or Joan Brock, D/B/A Creative Caffeine."[9] Brock has always used the CC account to hold funds derived from renting the recording studio to third parties.

---

[9]Although the account number changed when the funds were transferred from Bank of America to SunTrust Bank, the court refers to these accounts as one account——the CC account——because virtually the entire balance (less $30) was transferred to the SunTrust account, and the basic purpose of the new account remained the same, i.e., to hold money generated from renting the recording studio.

Creative Caffeine is the name Brock assumes in billing third parties for their use of the studio. Creative Caffeine's sole business is renting the recording studio. Brock began the Creative Caffeine business in mid-2004, and he established the CC account sometime in mid-2005. Before March 2006 Brock had never transferred money from the CC account to the BMI account or even to the 357 account. Since March 2006, the CC account has been used for BMPI's benefit, and Brock has made various online transfers of money from the CC account to the 357 account, which BMPI then controlled.

Defendants characterize Creative Caffeine as a division of BMI, and they characterize the CC account as having been a BMI account until March 2006. They maintain that, as of March 1, 2006, Creative Caffeine and the CC account were transferred to BMPI; after March 1, 2006, the CC account was a BMPI account and Creative Caffeine was a division of BMPI. Defendants point out that BMI paid taxes on Creative Caffeine income until March 2006, and that, after March 1, 2006, BMPI began paying taxes on Creative Caffeine's income.

Although "Creative Caffeine" was a name on the CC account, the account was also in the name of Brock, individually, and later in the name of Brock and Joan, individually. Brock admitted that he and his wife exercise control over the CC account, and that the CC account was set up as a personal account.

>    Q.   So this is just your own personal bank
>         account that you have put the name
>         Creative Caffeine on.
>    A.   Yes.
>    Q.   It's not different than any personal
>         checking account I may have.
>    A.   Correct.
>    Q.   And that's where you deposited the money
>         that you generated from leasing out the
>         recording studio with respect to the
>         invoices we see here at Exhibit 39.
>    A.   Correct.

Tr. 1:233.  Brock repeatedly acknowledged in his December 12, 2007 deposition that the CC account was an "individual account," not an account of BMPI, even after March 2006.  Although he testified that the CC account existed for the benefit of BMPI after March 2006, Brock acknowledged that the CC account contained "individual assets that BMPI can freely utilize."  Brock Dec. 12, 2007 Dep. 83:6-7. When asked whether BMPI had any bank accounts other than the 357 account at SunTrust Bank, Brock responded, "No."[10]  Moreover, when CC supposedly became a division of BMPI on March 1, 2006, nothing on the account bank statements indicates a change in ownership.  In terms of the basic account information, the CC account bank statement for March 2006 is exactly the same as the one for February 2006.

In his October 26, 2006 deposition, Brock spoke of Creative Caffeine as a personal venture, separate from BMPI:

---

[10]The CC account was with SunTrust Bank from April 2006 onward.

> Q. How long has [Peterson] been employed by BMPI?
> A. Since March 1st of 2006.
> Q. Does he continue to draw a salary?
> A. Not from that company.
> Q. Okay. From another company that you own?
> A. Yes.
> Q. Which company?
> A. It's a sole proprietorship, Creative Caffeine.

Brock Oct. 26, 2006 Dep. 19:12-19. Later in the deposition, Brock testified that Creative Caffeine was a sole proprietorship: "Creative Caffeine is sole proprietorship. It is owned strictly, solely by me." *Id.* at 102:11-12. When asked how long Creative Caffeine had been paying for the upkeep of the equipment in the recording studio, Brock explained, "It started,—it started loaning money to Brock Music Productions, Inc. probably four months ago." *Id.* at 105:18-19. If Creative Caffeine were merely a division of BMPI at this point, it would not make sense to make "loans" to BMPI. As with the 357 account, that BMI paid taxes on Creative Caffeine income until March 2006, and that BMPI paid taxes after that, is not dispositive in characterizing the ownership of the CC account. Moreover, Rollins—BMI and BMPI's tax lawyer who prepared BMI's and BMPI's tax returns during these years—testified at trial that he was not aware in preparing these tax returns that Creative Caffeine even had a separate bank account. The court finds that the CC account was always, and remains, a personal account of Brock, owned in his individual capacity.

C

On the *Allen* factor that addresses undercapitalization,
defendants argue that the controlling inquiry is whether the
company started with the statutory minimum amount of capital for
incorporating a company: $1,000. *See Newman v. Bartee*, 787 S.W.2d
929, 931 (Tenn. Ct. App. 1990) ("While [the company] was organized
with capital of $1,000 and did 'go under,' the evidence is that
[the company] was properly formed and capitalized pursuant to all
applicable statutes."). Later decisions of Tennessee courts of
appeals, however, suggest that the statutory minimum capitalization
is not controlling. In *Oceanics Schools* the court held that the
undercapitalization factor supported piercing, even though the
company being pierced was capitalized with $2,000, more than the
statutory minimum. *See Oceanics Schools*, 112 S.W.3d at 141. In
considering the undercapitalization factor, the court also relied
on the fact that, at the time the plaintiff obtained a judgment
against the company being pierced, the company owed the controlling
shareholder over $800,000 based on personal loans to the company.
*Id.*

In *VP Buildings, Inc. v. Polygon Group, Inc.*, 2002 WL 15634
(Tenn. Ct. App. Jan. 8, 2002) (unpublished opinion), the court
concluded: "[The company] was initially capitalized with $500, a
gross undercapitalization considering the nature of the business in
which [the company] is engaged." *Id.* at *6. Although $500 may not

have met the statutory minimum for initial capitalization, the court did not even mention the statutory requirement, and it indicated that the undercapitalization factor depended on the industry in which the company conducted business.

Consistent with *Oceanics Schools* and *VP Buildings*, the Supreme Court of Tennessee held in *Electric Power Board of Chattanooga* that the most important factor in deciding to pierce the corporate veil was that, at the time the plaintiff's claim arose against the company being pierced, the company owed its parent company $725,000 and was insolvent. *Elec. Power Bd.*, 691 S.W.2d at 527 ("Of course, all the facts have some effect, but we think it is particularly significant that at the time of this accident [the subsidiary] owed [its parent company] $725,000, or more, and was insolvent."). The court also noted that the subsidiary had an initial capitalization of $12,300. *Id.* at 525. It does not matter whether these cases show that the *Allen* factor concerning undercapitalization looks beyond the statutory minimum for initial capitalizations, or whether the decisions create a new piercing factor focusing on the capitalization at the time the plaintiff's claim arose. Either way, a company's capitalization at the time the plaintiff's claim arose is an important factor in the piercing analysis.

TRG's indemnity claim against BMI arose sometime after the parties entered into the Rights Agreement in September 8, 2003, but before TRG settled the copyright violation case with EMI on

September 24, 2004.  Brock testified that, by the end of 2002, BMI
owed him personally $149,187 in unpaid rent for the use of the
recording studio.  BMI's back rent liability only grew over the
next few years, reaching an indebtedness of $209,187 by the end of
2005.  Moreover, as of September 8, 2003 to September 24, 2004, BMI
owed Brock individually at least $8,000 for a personal loan.
During this same period, BMI's bank account never had a month-end
balance that exceeded $87,000.  Brock also testified that the UCC-1
he filed on February 10, 2006 covered essentially all of BMI's
tangible assets, the recording studio equipment, and that the value
of BMI's tangible assets is less than $30,000.  Moreover, Brock
acknowledged that, from the moment BMI signed the Rights Agreement,
BMI did not have sufficient resources to fulfill its indemnity
obligation.

The court finds that, at the time BMI entered into the Rights
Agreement, and thereafter, it was not only unable to fulfill its
indemnity obligation with TRG, but BMI was very much insolvent and
heavily indebted to Brock, its sole shareholder.  These facts
support the finding that BMI's corporate structure must be
disregarded.  *See Elec. Power Bd.*, 691 S.W.2d at 527; *Oceanics
Schools*, 112 S.W.3d at 141.

D

BMI diverted large amounts of its money to Brock's personal
bank account—the 357 account—to the detriment of BMI's creditors.

BMI received notice of EMI's copyright lawsuit against TRG, and thus was on notice, as of March 30, 2004, of its potentially large liability to TRG. The very next month, on the advice of the attorney who represented BMI in the copyright matter, BMI began depositing all of its incoming checks into Brock's personal account, the 357 account. The explicit purpose of using the 357 account for BMI's incoming checks was to keep the BMI account balance low. BMI continued this arrangement until the 357 account was transferred to BMPI in March 2006. Even if Brock did not acquire any personal benefit from placing BMI's funds in his personal account (the 357 account), and then transferring these funds back to the BMI account when BMI needed to pay bills, this arrangement demonstrates that Brock and BMI did not observe BMI's corporate separateness. *See*, *e.g.*, *Oceanics Schools*, 112 S.W.3d at 141 (relying on failure to observe corporate formalities in upholding trial court's finding that company's corporate form should be disregarded).

But Brock in fact personally benefited from placing BMI's money in the 357 account, even if the only payments made directly to him from that account were his regular BMI salary payments. That the bulk of BMI's liquid assets were in Brock's personal account, and not in BMI's account, placed additional hurdles in the paths of BMI's creditors who were seeking to collect their debts. Brock's arrangement of holding most of BMI's assets in the 357

account between April 2004 and March 2006 made it more difficult for judgment creditors of BMI to collect their judgments.

For example, the quick and relatively inexpensive method of executing a judgment on a company's bank account through garnishment would not necessarily be available to a judgment creditor of BMI who wanted to reach BMI's funds in the 357 account. It appears that, under Tennessee law, only a judgment debtor may be joined as a defendant in suit for garnishment. *See* Tenn. R. Civ. P. 69.05; *see also Tenn. Indus. Mach. Co. v. Accuride Corp.*, 139 S.W.3d 290, 294 (Tenn. Ct. App. 2004) ("[A] final garnishment judgment may be entered against a garnishee only where it appears that the garnishee is indebted to the principal judgment debtor defendant." (internal quotation marks and brackets omitted)). Thus if a judgment creditor of BMI had served a writ of garnishment on National Bank of Commerce (or, later, SunTrust Bank), neither garnishee would have been required to list monies held in the 357 account, because this account was not set up as a BMI account. While Tennessee courts have not resolved the issue, other state courts have held "that a bank served with a writ of garnishment may rely on its deposit agreements when determining to whom it is indebted." *E.g., Bank One, Tex. N.A. v. Sunbelt Sav., F.S.B.*, 824 S.W.2d 557, 557 (Tex. 1992) (per curiam); *Staley v. Brown*, 146 So. 2d. 739, 741 (Miss. 1962); *Anderson Boneless Beef, Inc. v. Sunshine Health Care Ctr., Inc.*, 852 P.2d 1340, 1343 (Colo. Ct. App. 1993)

(holding that bank served with writ of execution cannot be held liable to judgment creditor unless it handles funds in name of judgment debtor, and duty of garnishee bank is to find out whether defendant named in writ of execution has funds on deposit with it, and need not examine affairs of any person other than the one named in the writ); *Flat Iron Mac Assocs. v. Foley*, 600 A.2d 1156, 1162 (Md. Ct. Spec. App. 1992).

In *Bank One* the judgment creditor-garnishor discovered evidence that the judgment debtor-defendant had commingled his personal funds in a company account, and it pleaded commingling of funds in its garnishment application. *Bank One*, 824 S.W.3d at 557-58. But because the company was not joined as a defendant in the writ of garnishment, the company's bank properly answered the writ by stating it was not indebted to the judgment debtor because it did not have any deposits under the name of the judgment debtor. *Id.* at 558 ("A garnishee bank is not indebted to a judgment debtor unless some form of deposit agreement creates a debtor-creditor relationship between the bank and the judgment debtor.").

In *Anderson Boneless Beef* the court held that the garnishee-bank was not liable to the judgment creditor-garnishor for asserting in its answer to the writ of garnishment that it did not possess funds of the judgment debtor-defendant, even though the garnishee-bank held an account of an entity related to the judgment debtor and in which the related entity deposited checks made

payable to the judgment debtor.  *Anderson Boneless Beef*, 852 P.2d at 1342-44.

In *Flat Iron Mac Associates* the court held that, upon service of the writ of garnishment, the garnishee bank was not required to hold funds of the judgment debtor in an account under a different name, even though the bank had actual notice that the funds in the other account belonged to the judgment debtor, and the account owner admitted that the funds in the account belonged to the judgment debtor.  *Flat Iron Mac Assocs.*, 600 A.2d at 1162.

The court's conclusion that BMI's use of the 357 account diverted corporate assets from BMI to the detriment of BMI's creditors is also supported by the timing of BMI's actions.  Within one month of receiving notice of a potentially large liability of BMI to TRG, Brock (through BMI) decided to deposit BMI checks into the 357 account to keep the BMI account balance low.

Moreover, within days of TRG's obtaining a judgment against BMI, Brock also transferred thousands of dollars of BMI funds to BMPI.  At the beginning of March 2006,[11] the 357 account was transferred into the name of BMPI, although the account remained with the same bank, SunTrust Bank, and retained the same account number.  Brock testified at trial, as he did during his December 12, 2007 deposition, that he depleted the 357 account by paying BMI

---

[11]There is no persuasive evidence of the exact date that the account switched to BMPI's control, but BMPI started writing checks from the 357 account as early as March 15, 2006.

debts before transferring the account to BMPI, and that the initial funding of BMPI came from personal loans.

Brock gave a different explanation, however, of the initial funding of BMPI at his October 26, 2006 deposition, which he gave just months after the events took place. Brock acknowledged that there was already money in BMPI when it was started, and that these funds were derived from composing the score for the movie "No Regrets." BMI performed the work for "No Regrets," and the only payment received for these services, a $15,000 check, was deposited in the 357 account on June 15, 2004. Brock testified that there was already approximately $30,000 in BMPI when it was formed. When asked where this $30,000 was when BMPI was first formed, Brock responded that is was in a personal bank account. Brock testified that BMPI's initial bank account was with SunTrust, and that "it already had some personal money in it. So, essentially, I loaned it money that was already in the account." Brock Oct. 26, 2006 Dep. 21:23-25. Brock explained:

> Q. Okay. You testified that there was this approximately $30,000 already in the company?
> A. Uh-huh.
> Q. Which was in your personal bank account?
> A. Right.
> Q. How did that money get into the newly-created account?
> A. I loaned it to it.
> Q. From Jeff Brock, in your individual capacity?
> A. Yes.
> Q. To the company?
> A. Uh-huh.

> Q. Now, this is money that you testified was already in the company from this previous movie score?
> A. Uh-huh . . . .
> Q. This approximately $30,000 from a previous movie score ——
> A. Right, that was in a personal account that I loaned then to BMPI . . . .
> Q. Then Jeff Brock, in your personal capacity, lent approximately $30,000 to BMPI?
> A. Right.
> Q. The source of that fund —— of those funds was from a previous movie score ——
> A. Yes.
> Q. —— that you had done?
> A. And a couple of smaller projects.

*Id.* at 22:1-15, 23-25; 23:1-18. This description of BMPI's initial funding was given not only at a point closer in time to the events in question, it was provided at a time when Brock had less opportunity or motive to revise his testimony as he became aware of the consequences of his version of the facts. It also accords with the court's characterization of the 357 account as a personal account of Brock that was used to hold BMI funds before they were transferred to BMPI. The payments for the movie score for "No Regrets" and for the handful of smaller projects were BMI monies that were placed in the 357 account. Brock considered these funds to be his personal funds, which formed the basis of the "personal loan" to BMPI for BMPI's initial funding.

The bank records for the 357 account also indicate that the account was not depleted before the funds were transferred to BMPI. Brock deposited $20,016.58 into the 357 account on February 6,

2006. From that date onward, the bank records indicate that, before the account was transferred to BMPI, only $12,271.55 of checks were written. Although the records of the 357 account produced in this case do not reveal the account's balance at any point in time, Brock admitted during his trial testimony that he possessed the documentation that would have established the balance of the 357 account when it was transferred to BMPI:

> Q. Now, you haven't produced any other bank statements or documentation showing what the balance was in the 357 account at the time that it switched to BMPI.
> A. No.
> Q. You haven't provided any such documentation in this case?
> A. No, I have not.
> Q. That's certainly documentation that you would have at your disposal, though?
> A. Yes.

Tr. 1:239-40.

Even if the absence of documentary proof of the account balance were not attributable to defendants' inadequate discovery responses,[12] they cannot rely on the absence of such records to defeat TRG's claims. Although Tennessee courts do not shift the burden of proof from the plaintiff in a piercing claim, they hold that the absence of documentary proof for certain transactions for which such documentation should exist and should be in the possession of the defendant does not defeat the plaintiff's claim.

---

[12]As noted earlier, *see supra* note 8, in requests for production and in a subpoena, TRG specifically requested all bank statements related to BMI, BMPI, and Brock individually.

*See Murroll Gesellschaft M.B.H.*, 908 S.W.2d at 214 ("This record is impressive—not from the facts revealed therein, but from the lack of facts revealed.  For example, the record contains not a single check, invoice or book entry regarding transactions between the two defendant corporations, nor a single operating statement, balance sheet or tax return."); *VP Buildings*, 2002 WL 15634, at *7.  After the plaintiff in *VP Buildings* filed suit against the defendant corporation, the corporation borrowed $300,000 against its only asset.  *Id.* at *2.  The company's sole shareholder testified that the $300,000 was used to pay legitimate company debts, but she provided no documentation regarding how the borrowed money was spent.  *Id.*  She argued that the plaintiff could not prove that she had failed to apply the $300,000 to legitimate expenses, and she reminded the court that the plaintiff had the burden of proving facts sufficient to justify piercing.  *Id.* at *6.  The court upheld the trial court's finding that the company was the alter ego of the sole shareholder, despite documentary proof of the alleged diversion of the company's assets:

> [The sole shareholder] cannot rely on the
> failure of documentary proof of use of the
> money . . . from the loan on the corporation's
> asset, all evidence within her control.  This
> court has considered the inability to
> demonstrate a lawful justification for a
> diversion of funds from one corporation to
> another as proof of corporate abuses
> sufficient to justify piercing the corporate
> veil and holding two shareholders personally
> liable on the debts of their corporation.

*Id.* at *7 (internal quotation marks omitted) (quoting *Judd's Inc. v. Muir*, 1998 WL 338212, at *4 (Tenn. Ct. App. June 26, 1998)). This court therefore finds that, in transferring to BMPI the 357 account (which had BMI funds in it), Brock caused thousands of dollars of BMI money to be diverted to BMPI, to the detriment of BMI's creditors.

E

Brock used BMI as an instrumentality to serve his personal venture, Creative Caffeine. From mid-2004 until December 31, 2006, when Creative Caffeine rented the recording studio to third parties, BMI has been paying or accruing an annual rent debt of $57,000.[13] Moreover, most of the equipment that customers of Creative Caffeine used when renting the recording studio belonged to BMI. But all of the money generated from renting the studio to third parties went directly into Brock's personal bank account, the CC account. No money was ever remitted to BMI from the CC account, even after the CC account was supposedly transferred to BMPI. The funds generated from renting the studio (for which BMI was paying rent) and the equipment (which BMI owned) should have gone to BMI. Instead, Brock used BMI, and later BMPI, as a tool to advance his personal venture, Creative Caffeine.

Brock's placement into the CC account of monies derived from renting the recording studio can also be viewed as diverting

---

[13]This is an average based on the two lease agreements.

corporate assets, to the detriment of BMI's creditors. At the very least, it shows Brock's failure to observe the separateness of BMI and himself. Moreover, Brock offered no legitimate business explanation for the supposed transfer of the Creative Caffeine income stream to BMPI in March 2006, when BMI was still obligated to pay rent and still owned most of the equipment. The transfer of the Creative Caffeine income stream to BMPI deprived BMI of the profits it would otherwise have realized from renting the studio, thereby harming BMI's creditors.

The CC account was a Brock personal bank account that contained funds that should have been remitted to BMI. According to Brock, as of March 1, 2006 the CC account became the account of BMPI. Although the court finds that the CC account remained Brock's personal account, the transfer of the CC bank account to BMPI would have conveyed to BMPI in excess of $5,000 of BMI funds that were on deposit in the CC account as of February 28, 2006. The bank records demonstrate that the funds in the CC account were not depleted before the account was allegedly transferred to BMPI on March 1, 2006. Thus even under defendants' characterization of the CC account, BMI diverted assets to BMPI, to the detriment of BMI's creditors.

After the CC account supposedly became a BMPI account, Brock periodically transferred funds from the CC account to the 357 account, which was then controlled by BMPI. Based on the court's

previous findings that the CC account remained Brock's personal account, and that the income stream going into the CC account should have gone to BMI, these transfers constitute a further diversion of BMI assets and a disregard for the separateness of BMI, BMPI, and Brock.

F

Brock also exploited his control over BMI to carry out illegal, fraudulent transfers. Many of the examples cited above of BMI's diverting corporate assets to the detriment of its creditors can also be viewed as fraudulent transfers. But because the court has considered them under the rubric of another *Allen* factor, in considering the fraudulent transfer factor, the court will focus exclusively on Brock's filing of the UCC-1 on February 9, 2006. To the extent there is a conflict in law between Texas and Tennessee on fraudulent transfers, the court applies Tennessee law.[14]

---

[14]According to Texas choice-of-law rules, "'the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue.'" *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1413 (5th Cir. 1995) (quoting *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984)); *see Amoco Chem. Co. v. Tex Tin Corp.*, 925 F. Supp. 1192, 1202 n.9 (S.D. Tex. 1996) (applying "most significant relationship" choice-of-law test to fraudulent transfer claim). Tennessee has the most significant relationship to the issue whether the filing of the UCC-1 was fraudulent. Brock, a Tennessee resident, filed the UCC-1 with the Tennessee Secretary of State, and the UCC-1 purported to encumber the assets of BMI, a Tennessee corporation.

> A transfer made or obligation incurred by a
> debtor is fraudulent as to a creditor whose
> claim arose before the transfer was made or
> the obligation was incurred if the debtor made
> the transfer or incurred the obligation
> without receiving a reasonably equivalent
> value in exchange for the transfer or
> obligation and the debtor was insolvent at
> that time or the debtor became insolvent as a
> result of the transfer or obligation.

Tenn. Code Ann. § 66-3-306 (2004). A "transfer" includes the
"creation of a lien or other encumbrance." Tenn. Code Ann. § 66-3-
302(12) (2004). "A debtor is insolvent if the sum of the debtor's
debts is greater than all of the debtor's assets, at a fair
valuation." Tenn. Code Ann. § 66-3-303(a) (2004). "Debts" include
claims against the debtor whether or not they have been reduced to
a judgment. *Id.* at § 66-3-302(3) & (5).

By the end of 2005, and within months of the UCC-1 filing, BMI
owed Brock over $200,000 in unpaid rent for the recording studio.
TRG also had a claim against BMI, in the form of an arbitration
award, for over $200,000. BMI's tangible assets were worth no more
than $30,000. Less than $15,000 was in the BMI account at the time
of the UCC filing. Thus at the time Brock filed the UCC-1 on
February 9, 2006, BMI was insolvent.

A financing statement such as a UCC-1 does not of itself
create a security interest, but it perfects a security interest.
Tenn. Code Ann. § 47-9-310 (2001); *see*, *e.g.*, *AmSouth Bank v.
Trailer Source, Inc.*, 206 S.W.3d 425, 427 (Tenn. Ct. App. 2006).
And a UCC-1 is effective in perfecting a security interest only to

the extent it was filed by a person entitled to file it. Tenn. Code Ann. § 47-9-510 (2001). Brock was entitled to file the UCC-1 only if BMI authorized him to file it in an authenticated record, or Brock had a security agreement from BMI covering the assets of the UCC-1 filing. *See* Tenn. Code Ann. § 47-9-509 (2001). To the extent the UCC-1 was effective in perfecting a security interest in BMI's recording equipment, Brock, as BMI's President, must have conferred upon himself, individually, a security interest in the equipment.[15]

Brock admitted that the underlying debt for the UCC-1 filing was entirely based on BMI's unpaid rent. Brock also acknowledged that, before he filed the UCC-1, he did not have a security interest in any of BMI's assets. The lease agreements on which the back rent was based do not confer on Brock a security interest in BMI's assets. Brock clearly denied that there was any consideration given to BMI in exchange for the security interest on which the UCC-1 was based. Because BMI did not receive reasonably equivalent value for granting Brock a security interest in all of its tangible property, and because BMI was insolvent at the time of the transfer, the transfer was fraudulent. Before BMI granted to Brock the security interest on which the UCC-1 filing was based, Brock was similarly situated to TRG: an unsecured creditor with a

---

[15]Brock's answers to questions indicate that his understanding was that BMI did grant Brock a security interest in connection with the UCC-1 filing.

large claim against BMI.  By fraudulently granting Brock a security interest in BMI's property, BMI made Brock a secured creditor on all of its tangible assets.  This placed Brock in a much better position than it did TRG to collect from BMI, even though TRG was but weeks away from obtaining a default judgment against BMI.  Once TRG had a judgment, it could have easily become a secured creditor. This fraudulent transfer weighs in favor of piercing BMI's corporate veil.[16]  *See Allen*, 584 F. Supp. at 398 (relying on fraudulent transfers under Tennessee version of Uniform Fraudulent Transfer Act to pierce corporate veil).

G

Brock, BMI, and BMPI all failed to maintain an arms-length relationship among themselves.  Beginning in March 2006, when BMPI first began to operate, BMPI "loaned" BMI money by periodically paying BMI's bills.  The only documentation for these loans is the record that the bills were paid.  Brock testified that the name of the entity billed did not matter, and that what mattered was who was paying the bill.  BMPI also began making salary payments to Brock that were owed by BMI for periods of work when BMPI did not even exist.  Brock initially stated that these BMPI salary payments on behalf of BMI were not loans, but he later testified that they

---

[16]The court's finding of fraudulent transfer with respect to Brock's UCC-1 filing in support of TRG's piercing claim is not the same as a declaration that this transfer was fraudulent. *See infra* at § V.

were.  Brock asserted that his handwritten salary log was the documentation for these "loans" to BMI.  But when reviewing the copies of the BMPI checks going out of the 357 account after March 2006, Brock was unable to identify which checks were on behalf of BMI and which were on behalf of BMPI, although this was then a BMPI account.  After March 2006 Brock paid legal fees for himself and for BMPI from 357 account.  But BMI also paid legal fees for BMPI and for Brock individually.  Although BMPI and Brock are the only defendants in this case, BMPI and Brock individually have not paid any legal fees in connection with this case.  BMI has paid all the legal fees of Brock and BMPI through "loans" from BMPI or from the meager funds that BMI has earned since March 2006.  It is not clear what business justification BMI had in paying BMPI's and Brock's legal fees in this case.

H

The court finds that BMPI was a sham corporation.  BMI and BMPI's stated business objectives were very similar.  BMI's business purpose from its creation was to produce jingles, songs, advertisements, and other musical compositions.  BMPI was also set up for the purpose of producing record projects and other types of musical endeavors.  The names of the two companies are almost exactly the same: BMPI's name includes the word "Productions." BMPI's name is even closer to the name of BMI's predecessor, "Brock Musical Productions, Inc."  BMI and BMPI had exactly the same

corporate structure, and the same directors, officers, and employees. But BMPI never had any clients, never performed any projects, and never made any sales. Other than monies coming in from the CC account, BMPI never had any income of its own. Brock never developed a budget for BMPI. Brock incorporated BMPI on February 17, 2006. By October 2006, BMPI was functionless.

The timing of BMPI's formation is also suspect. When TRG filed suit against BMI in December 2005 to reduce its arbitration award to a judgment, Brock made a conscious decision not to defend the suit. By January 2006 Brock knew that TRG would obtain a default judgment against BMI for over $200,000. Brock incorporated BMPI just 11 days before TRG obtained a default judgment. And as noted *supra* at § IV(D) and (E), shortly after BMPI's formation, BMI transferred to BMPI a substantial amount of money: the balances in the 357 account and the CC account, and the future income stream of Creative Caffeine.

I

Last, TRG has proved that Brock's control of BMI and BMPI has proximately caused TRG's inability to collect its judgment.[17] Defendants emphasize that TRG has not attempted to execute on its judgment. But as of March 1, 2006, all of BMI's tangible assets

---

[17]But for the abuse of the corporate form, TRG would have been able to collect on at least some of its judgment. There is no indication that Tennessee law requires that, but for the misconduct of Brock, BMI, and BMPI, TRG would have been able to satisfy the entire judgment.

were encumbered by Brock's lien, and there was less than $8,000 in the BMI bank account. Within a few months, BMI's account balance was just a few hundred dollars. In his October 26, 2006 deposition, Brock explained that BMI was no longer doing any business because it had no money and no assets. Attempting to execute on TRG's judgment would have been largely futile and a waste of resources.

J

Considering all these facts as a whole, the court finds by a preponderance of the evidence that BMPI and Brock are the alter egos of BMI, and that justice requires that TRG pierce BMI's and BMPI's corporate veils. The court declares that BMI, BMPI, and Brock are a single business enterprise and that BMPI and Brock are jointly and severally liable for the state court judgment that TRG obtained against BMI.[18]

V

TRG seeks in its second claim a declaration that various transfers from BMI to BMPI were fraudulent and are therefore void. TRG also seeks a declaration that BMI's granting a lien to Brock was fraudulent and is therefore void. In light of the relief granted *supra* at § IV(J), the court in its discretion opts not to resolve these latter declaratory judgment requests. Because TRG

_____

[18]Defendants do not dispute that, if they are liable to TRG, such liability is joint and several.

can now enforce its judgment against Brock individually and against BMPI, these additional declarations, even if meritorious, do not appear to be sufficiently necessary to warrant the entry of declaratory judgment.

\*      \*      \*

For the reasons stated, the court finds in favor of TRG on its claim that Brock and BMPI are the alter egos of BMI, that all three are a single business enterprise, and that BMPI and Brock are jointly and severally liable for the state court judgment. The court therefore enters judgment in favor of TRG against Brock and BMPI.

July 18, 2008.


_____
SIDNEY A. FITZWATER
CHIEF JUDGE